Filed 6/9/22  P. v. Ramirez CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALEJANDRO RAMIREZ,<br><br>    Defendant and Appellant. | H043461<br>(Santa Clara County<br>Super. Ct. No. 211412)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING |

It is ordered that the opinion filed on May 17, 2022, be modified as follows:

On page 42, in the third full paragraph, beginning with "Between the prosecutor's argument …[,]" delete the word "extortion" and insert "exaction" in its place, so that the sentence reads as follows:

Between the prosecutor's argument and the jury instructions referenced by the trial court in its response to the jury's question, there was no reasonable likelihood that the jury was misled about the difference between kidnapping for exaction and kidnapping for robbery.

There is no change in the judgment.  Appellant's petition for rehearing is denied.

Dated:_____       _____
                                                                                            Greenwood, P.J.

                                                                        _____
                                                                                            Grover, J.

Filed 5/17/22  P. v. Ramirez CA6 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALEJANDRO RAMIREZ,<br><br>    Defendant and Appellant. | H043461<br>(Santa Clara County<br>Super. Ct. No. 211412) |

In 2003, the federal Drug Enforcement Agency (DEA) began investigating a drug trafficking operation (DTO) headed by Jose Vargas-Alvarez.  Defendant Alejandro Ramirez[1] was part of the DTO, which transported and sold large quantities of cocaine and methamphetamine throughout the San Francisco Bay Area as well as southern California.

Following a trial, a jury convicted Ramirez of multiple drug-related offenses, as well as offenses related to the kidnapping of a third party whom Vargas-Alvarez suspected was involved in the theft of $2 million and drugs from one of the operation's "stash" houses.  The trial court sentenced Ramirez to a term of life in prison without parole, consecutive to 25 years to life, consecutive to 33 years eight months.

On appeal, Ramirez challenges the sufficiency of the evidence to support his convictions for:  (1) conspiracy to commit murder (counts 4, 5); (2) the possession

---

[1] Ramirez is designated in the indictment as "Alejandro Rocha aka Carnaria, Tocano."  In subsequent proceedings, defense counsel confirmed that his true name is "Alejandro Ramirez."

charges (counts 10-12, 14-16, & 28); and (3) the arming enhancement allegations attached to counts 4, 9, 10, and 11. Ramirez also argues the trial court erred in instructing the jury on: (1) conspiracy to commit murder (counts 4, 5); (2) aggravated kidnapping (count 1); and (3) kidnapping for robbery (count 2). Next, Ramirez contends the trial court: (1) erred in permitting certain expert testimony at trial; and (2) abused its discretion in denying his request to strike the sentencing enhancement in connection with aggravated kidnapping (count 1). In addition, Ramirez asserts that the abstract of judgment must be corrected to strike an arming enhancement in connection with count 5 because no such allegation was made in the indictment.

Ramirez also requests that this court independently review: (1) the sealed wiretap applications to determine if the trial court erred in denying his motions to quash or traverse the wiretap warrants or quash the evidence; and (2) various sealed transcripts from ex parte in camera hearings to determine if the trial court abused its discretion or violated Ramirez's due process rights in ruling on the prosecution's assertions of privilege and delay of discovery.

Due to a change in the law following the close of briefing, we requested supplemental briefing from the parties as to the effect of Assembly Bill No. 1869 (2019-2020 Reg. Sess.) on the appeal, specifically its repeal of former Government Code section 29550 et seq., as well as its enactment of Government Code section 6111.

For the reasons explained below, we conclude that the trial court committed prejudicial instructional error requiring reversal of Ramirez's convictions for conspiracy to commit murder (counts 4 & 5). The People shall have the option to retry Ramirez on those charges, as we reject his sufficiency of the evidence claims on those offenses. We also reject Ramirez's remaining claims in their entirety.

# I.    FACTUAL AND PROCEDURAL BACKGROUND

## A. Procedure

### 1. Indictment

On June 25, 2009, Ramirez was charged in an indictment with kidnapping for extortion (Pen. Code, § 209, subd. (a); count 1);[2] kidnapping for robbery (§ 209, subd. (b)(1); count 2); kidnapping to another county (§ 207, subd. (a); count 3);[3] two counts of conspiracy to commit murder (§§ 182, subd. (a)(1), 187; counts 4, 5); conspiracy to transport, sell, or provide more than 80 kilograms of cocaine (§ 182, subd. (a)(1), Health & Saf. Code, §§ 11352, 11370.4, subd. (a); count 9); possession of more than 80 kilograms of cocaine for sale (Health & Saf. Code, §§ 11351, 11370.4, subd. (a); count 10); possession of more than 57 grams of methamphetamine for sale (Health & Saf. Code, § 11378; count 11); possession of a silencer (§ 12520; count 12); possession of more than $100,000 for the purchase of drugs (Health & Saf. Code, § 11370.6; count 14); three counts of possessing false compartments for the purpose of smuggling drugs (Health & Saf. Code, § 11366.8, subd. (a); counts 15, 16 & 17); and possession of an assault weapon (§ 12280, subd. (b); count 28).  The indictment further alleged that Ramirez was personally armed with a firearm in connection with the conspiracy to commit murder charged in count 4 and the drug offenses charged in counts 9, 10, and 11 (Health & Saf. Code, § 11370.4, subd. (a); §§ 1203.073, subd. (b)(2), 12022, subds. (c), (d)).  As to the drug offenses, it was alleged that Ramirez knew that a principal in those crimes was armed with a firearm (§ 12022, subd. (d)).

---

[2] Undesignated statutory references are to the Penal Code.

[3] Before the case was submitted to the jury, the trial court granted the People's motion to dismiss count 3 as a lesser included offense of count 2.

## 2. *Verdict and sentencing*

The jury found Ramirez guilty of all charges and found true all of the weight and arming allegations.

The trial court sentenced Ramirez to: (1) a term of life without the possibility of parole on count 1; (2) a term of seven years to life on count 2, stayed pursuant to section 654; (3) a consecutive term of 25 years to life on count 4; (4) a concurrent term of 25 years to life on count 5; (5) a consecutive determinate aggregate term of 33 years eight months in prison, consisting of: (a) a term of 33 years on count 9 (the middle term of four years, plus four years for the firearm enhancement (§ 12022, subd. (c)), plus 25 years for the weight enhancement (Health & Saf. Code, § 11370.4, subd. (a)); (b) a term of 34 years on count 10 (the middle term of three years, plus four years for the firearm enhancement (§ 12022, subd. (c)), plus 25 years for the weight enhancement (Health & Saf. Code, § 11370.4, subd. (a)(6)), stayed pursuant to section 654; (c) a consecutive term of eight months on count 11 (one-third the middle term of two years) with the four year term on the associated firearm enhancement stayed pursuant to section 654; (d) a concurrent middle term of two years on count 12; (e) a concurrent middle term of three years on count 14; (f) a concurrent middle term of two years on count 15; (g) a concurrent middle term of two years on count 16; (h) a concurrent middle term of two years on count 17; and (i) a concurrent middle term of two years on count 28. The trial court awarded credits of 2,940 days, consisting of 2,557 custody credits plus 383 credits pursuant to section 2933.1.

The trial court imposed the following fines, fees, and assessments: (1) a $10,000 restitution fund fine (§ 1202.4); (2) a $100 criminal laboratory administration fee plus a $280 penalty assessment (Health & Saf. Code, § 11372.5); (3) a $300 drug program fee plus a $840 penalty assessment (Health & Saf. Code, § 11372.7); (4) a $390 court security fee (§ 1465.8); (5) a $390 criminal conviction assessment (Gov. Code, § 70373);

4

and (6) a $259.50 criminal justice administration fee payable to the County of Santa Clara (former Gov. Code, §§ 29550, 29550.1, 29550.2).

### B. *Trial*

#### 1. *Prosecution case*

In 2006, DEA agents in San Jose began surveilling and investigating Vargas-Alvarez and his associates. Vargas-Alvarez directly employed seven or eight people in the DTO, including Ramirez, his cousin.

In a "good month," the DTO would receive shipments of anywhere from four- to five-hundred kilograms of cocaine from Mexico. Vargas-Alvarez obtained the cocaine and methamphetamine from Mexican drug cartels, and most of the proceeds of the DTO's sales, anywhere from $500,000 to as much as $3.4 million, were routed back to Mexico.

Once the drugs were delivered to the stash house[4] in San Jose, Vargas-Alvarez would distribute them to his clients who sold them on the streets.[5] A Vietnamese gang in Santa Clara County, led by Bao Luu, was one of Vargas-Alvarez's clients, obtaining most of the cocaine it sold from the DTO.

Ramirez began working for Vargas-Alvarez in 2007 at the DTO's stash house in Los Angeles. In 2008, after Ramirez obtained a driver's license,[6] he started driving vehicles which Vargas-Alvarez had equipped with hidden compartments, using them to deliver drugs to the DTO's stash houses in Los Angeles and San Jose, and to deliver cash

---

[4] According to a DEA agent, a stash house is "sort of like a distribution warehouse" for a trafficking organization's drugs before they are delivered to lower level suppliers to be sold.

[5] A DEA agent testified that, in 2009, the street value of one kilogram of cocaine was anywhere from $18,000 to $23,000.

[6] Ramirez obtained the driver's license using another person's birth certificate and Social Security number.

5

from San Jose to Los Angeles. Depending on the quantity of drugs that arrived from Mexico, Ramirez made deliveries anywhere from once a month to four times a week.

In 2008, Vargas-Alvarez decided to rent a large property in Gilroy (the Godfrey property) at which he could park a large recreational vehicle (RV) he intended to use to transport drugs to another stash house in Atlanta, Georgia. Ramirez signed the rental documents for the Godfrey property and showed the rental agent his identification. Ramirez helped Vargas-Alvarez find the RV and he took it into the auto shop to have the hidden compartment installed. The compartment could hold up to 100 kilograms of drugs and Vargas-Alvarez intended to use it regularly to deliver drugs to Atlanta.[7] Ramirez knew that the RV would be used to transport drugs and on at least one occasion, he helped load drugs into the RV's hidden compartment in preparation for a trip.

Using wiretaps, the DEA intercepted a number of telephone calls involving the DTO. On February 25, 2009, Ramirez and Vargas-Alvarez spoke by telephone about whether to get assistance from Bao Luu's gang, which the DEA understood was particularly violent. On March 3, 2009, Ramirez and Vargas-Alvarez had a phone conversation in which they discussed a particular type of cocaine that Vargas-Alvarez had in inventory. The wiretap picked up several other calls in March 2009 between Ramirez and Vargas-Alvarez discussing the transportation and distribution to clients of large amounts of cocaine.

### a. *The 2008 stash house robbery*

In 2008, the DTO's Northern California stash house was located in Fremont on Mission Street. Eduardo Gonzalez, also known as Guero, was one of two people who lived in the stash house and was responsible for ensuring that there was an accurate count

---

[7] On January 19, 2009, local law enforcement stopped the RV on Interstate 80 in Douglas County, Nebraska, and discovered 100 kilograms of cocaine hidden in a compartment underneath the vehicle.

of the money and drugs that were stored therein. However, Gonzalez became disrespectful to others in the DTO and Vargas-Alvarez fired him.

In August 2008, after Gonzalez had been let go, someone stole $2 million, methamphetamine, and a vehicle from the Mission Street stash house. Vargas-Alvarez suspected that Gonzalez and some of Gonzalez's friends were responsible. Vargas-Alvarez had Gonzalez and everybody in the DTO who was in San Jose take a lie detector test. Gonzalez was the only person who failed. Vargas-Alvarez then had Gonzalez come to the stash house, where Luu and two other men beat him up.[8] Luu and the other men put plastic on the floor to make Gonzalez think they would kill him. Despite the beating, Gonzalez consistently denied being involved in the robbery and, although Luu wanted to kill him, Vargas-Alvarez let him leave. However, Vargas-Alvarez still suspected that Gonzalez was responsible.

Vargas-Alvarez relocated the stash house from Mission Street to Rosemere Drive in Fremont and became more cautious in how he operated the DTO. Gonzalez went to Mexico and was reportedly spending "crazy amounts" of money.

### b. Plot to kidnap and kill Gonzalez and Gonzalez's mother in Mexico

On December 4, 2008, DEA agents intercepted a call between Vargas-Alvarez and Madrigal in which they discussed Gonzalez and Gonzalez's mother, who were both in Mexico. In that conversation, Vargas-Alvarez and Madrigal talk about taking Gonzalez and his mother to "eat," to a "movie," and on "vacation," and the DEA agents believed that these were coded references to a plan to simultaneously kidnap and possibly kill Gonzalez and his mother. Vargas-Alvarez and Madrigal wanted to compel Gonzalez to tell them where he put the money stolen from the stash house. They also targeted Gonzalez's mother, because she was familiar with Vargas-Alvarez's drug trafficking

---

[8] Some of the stolen money belonged to Bao Luu and some belonged to Ramon Madrigal, a drug dealer in Mexico and a major supplier of cocaine for the DTO.

activities and they also needed to determine what she knew about the theft from the stash house.

On December 17, 2008, Vargas-Alvarez and Madrigal spoke again on the phone about their belief that Gonzalez was "flaunting" the stolen money in Mexico. Vargas-Alvarez told Madrigal that Gonzalez had failed the lie detector test he had given to everyone else in the DTO. Vargas-Alvarez and Madrigal discussed getting the approval from Enrique Plancarte, who was "one of the head guys in the La Familia cartel," to move forward with the kidnapping and murder. Vargas-Alvarez and Madrigal also talked about how Madrigal would proceed: "And I take two of my guys, one to drive and the other . . . and we'll fuck him up like that . . . ." At another point in the call, Vargas-Alvarez and Madrigal also appeared to discuss kidnapping a third person currently in the United States and assaulting that person in front of Gonzalez in order to get Gonzalez to talk.

At the time this phone call was intercepted, DEA agents were following Vargas-Alvarez and an "unidentified Hispanic male," who may have been Ramirez, in an Infiniti associated with the DTO. The agents had observed Vargas-Alvarez drive a BMW, registered to Ramirez's home address, to the BMW dealership while the same "unidentified Hispanic male" followed Vargas-Alvarez in the Infiniti. After dropping off the BMW at the dealership, Vargas-Alvarez and the "unidentified Hispanic male" got into the Infiniti and drove to the Godfrey property in Gilroy together, where they worked on the RV.

### c. *Plot to kidnap and kill Luis Lopez*

Vargas-Alvarez and his group suspected that one of Gonzalez's friends, Luis Lopez, was involved in the robbery at the stash house. In February 2009, Ramirez talked with Vargas-Alvarez about their certainty that Lopez helped Gonzalez with the robbery, and how they would "[b]eat him up" to teach "him a lesson," just like Luu had done to Gonzalez. The plan evolved into kidnapping both Gonzalez and Lopez at the same time,

8

so they would reveal what they did with the stolen money. Ramirez would help with abducting Lopez, while other people would kidnap Gonzalez in Mexico. Ramirez was present during the planning sessions.

The group ultimately decided that someone, probably Vargas-Alvarez, would meet Lopez at a restaurant and then bring him to Vargas-Alvarez's apartment in San Jose. Two of Luu's friends would beat Lopez up then take him to the Rosemere Drive stash house in Fremont and hold him there. If Lopez gave up where the stolen money was, they would let him go or "probably kill him." Vargas-Alvarez had previously obtained a gun to protect the stash house, but he subsequently obtained a silencer from Luu "[i]n case they needed to use it with [Lopez]." Ramirez was present during the planning, knew about the gun, and was to take part in Lopez's abduction and his beating.

On March 10, 2009, the DEA intercepted a phone call between Vargas-Alvarez and Ramirez in which they discussed the plans to kidnap and murder Lopez. Two days later, they had two additional phone conversations in which they used coded language to confirm the timing of the Lopez kidnapping along with Luu's participation. Ramirez agreed to take part in the kidnapping, but asked Vargas-Alvarez if he could leave temporarily to go to the hospital for his daughter's surgery.

### d. *Lopez's abduction and captivity*

On March 12, 2009, the day before the kidnapping was to occur, Ramirez and another member of the DTO drove from Los Angeles to Fremont with approximately 100 kilograms of cocaine, which they delivered to the Rosemere Drive stash house.

On the following day, Vargas-Alvarez met Lopez at a restaurant in Santa Clara. They spoke in the parking lot for a time, then got into Vargas-Alvarez's truck and drove to Vargas-Alvarez's apartment at 378 La Strada in San Jose. They parked in the garage and Lopez followed Vargas-Alvarez inside, where "three or four guys" with guns, dressed in black, wearing dark glasses, masks and gloves, were waiting. The men screamed " 'Where is the money?' " and yelled at Lopez to get on the floor. They then

9

kicked, punched, and pistol-whipped Lopez. Ramirez was in the apartment, and told another member of the DTO that he hit Lopez "pretty hard" during the assault. As planned, Ramirez had brought the gun with the silencer over to the apartment "in case they need[ed] it." The men threatened to torture Lopez and hurt his fiancée if he did not talk. Lopez maintained that he did not know anything and had nothing to do with the robbery of the stash house. He thought the men would kill him. The men tied Lopez's hands and feet, put tape over his mouth, and covered his head with something like a pillowcase.

The men picked Lopez up and put him in the trunk of a car, and drove him to a different location. Lopez believed the trip took anywhere between 15 minutes and a half hour, though he had difficulty breathing and briefly lost consciousness while inside the trunk.

After the car stopped, the men pulled Lopez out of the trunk, carried him into the Rosemere Drive stash house, and put him inside a kitchen closet.[9] When he testified before the grand jury, Lopez said he saw Ramirez when the trunk of the car was opened, but at trial he said he could not see any faces. When Lopez was in the closet, his hands were bound with plastic ties.

On the first day of Lopez's captivity, he was beaten two or three times in the closet. Lopez later told a DEA agent that Ramirez was one of those who punched him.[10] Lopez was kept in the closet with a bag over his head, bleeding from his injuries. At some point, Lopez saw that his captors were cleaning up his blood, which made him

---

[9] Ramirez was present when Vargas-Alvarez discussed holding Lopez in that closet.

[10] Lopez's testimony as to where and when he saw Ramirez was inconsistent, and at one point, Lopez testified that he did not see Ramirez at all until he was being driven home after he was released.

10

think that they were going to kill him. The men did not give Lopez any food or water that first day nor was he allowed to use the bathroom.

Ramirez was present as the group talked among themselves after beating Lopez, saying he did not think Lopez was involved " 'otherwise he would have talked already.' " Ramirez said he hit Lopez "pretty hard" at the La Strada residence, and regretted doing so. Regardless, they kept Lopez tied up and confined in the closet.

On the second day, Ramirez and the others continued interrogating Lopez about the money but Lopez kept saying he knew nothing about it. They again beat Lopez, hitting his head and, at one point, stepping on his penis. The men replaced the plastic ties around his wrists and ankles with rope. They gave Lopez an El Mexicano yogurt and some Gatorade to drink.

Video surveillance of the Rosemere stash house from March 15, showed Vargas-Alvarez and Ramirez exiting the house. Ramirez was carrying a black bag similar to bags used by the DTO to deliver cocaine. A few minutes later, a silver Mercury sedan drove past the house. The sedan returned about 90 minutes later, and Vargas-Alvarez got out of the driver's seat and entered the house. Ramirez exited the passenger seat, got behind the wheel of the sedan, and drove away.

On March 16, Ramirez talked to Vargas-Alvarez on the phone about his daughter's surgery, saying they had just anesthetized her. Ramirez asked about "what happen[ed] with that guy" possibly referencing the kidnapping of Gonzalez and his mother. Vargas-Alvarez replied that it had been "2 days since they left the town," and supposedly he would "arrive early tomorrow morning," and "[they] will take care of it." However, Vargas-Alvarez said "[t]hey had said that since the other day." Ramirez responded, "honestly that shit is going bad, son of bitch [*sic*], [they] mess things up."

On the third day, the men gave Lopez breakfast. Ramirez had returned to the house and kicked Lopez at one point that day. That afternoon, the men took Lopez to the restroom, without covering his face. Lopez testified that he saw Vargas-Alvarez and

11

three others, but not Ramirez.[11]  That evening, Vargas-Alvarez concluded that Lopez was telling the truth and decided to release him.  They untied Lopez, and everyone sat together in the kitchen and ate.  Vargas-Alvarez apologized to Lopez and gave him some money as partial compensation for Lopez's motorcycle that Vargas-Alvarez had arranged to have thrown into a ravine after Lopez was kidnapped.[12]  Ramirez drove Lopez, with his head covered again but in the rear passenger seat rather than the trunk, and dropped him off near his house in Sunnyvale.  On the way, Lopez was driven to a location in the hills near Livermore and shown where they had pushed his motorcycle "off of a precipice."[13]

Lopez testified that, over the course of his captivity, he sustained injuries to his hands, feet, ribs, one eye, his nose, and bruising on his body.  He had a hard time hearing and breathing afterwards, but did not go to the hospital.  For months afterward, Lopez had difficulty sleeping and, at the time of trial, was still paranoid that "someone was going to come for [him]" or his family.

When investigators interviewed Lopez on March 20, 2009, his left eye was red, "like some blood vessels had popped inside his eyes," and he had marks on both wrists. Lopez was very nervous, his hands were shaking, and he continually looked to his left and right, emotional and shaking.  The investigators showed Lopez photos of 13 individuals to identify who was involved in his kidnapping.  Lopez initially said he did not recognize anyone in the photos, but later identified Ramirez as one of the kidnappers.

---

[11] When interviewed after his kidnapping, Lopez told investigators that Ramirez was there on the third day and was part of the continuing conversation about Lopez's role in the robbery of the stash house.

[12] Lopez drove his motorcycle to the restaurant where he met Vargas-Alvarez on March 14, 2009.

[13] Lopez also testified that his cell phone was taken from him when he was abducted and never returned.

DEA agents intercepted a telephone call on March 17, 2009, in which Vargas-Alvarez complained that they still did not know who had robbed the stash house, even though Ramirez[14] had given Lopez "some good punches." In another call that day, Vargas-Alvarez spoke about Lopez's captivity, confirming that Ramirez was one of the three men he sent to kidnap Lopez.

### e. *The DEA raid and first search*

At around 7:00 a.m. on March 18, 2009, law enforcement officers conducted a "takedown"[15] of the DTO, part of which involved executing a search warrant at the Rosemere stash house. Six adults, including Ramirez, were arrested at the two-story residence. Ramirez somehow managed to avoid detection during the initial sweep of the residence, but when an officer returned to the master bedroom to gather some clothes for a female detainee, the officer discovered Ramirez hiding under the bed.

In a locked upstairs bedroom, officers found 42 one-kilogram bundles of suspected cocaine in a closet along with plastic bags, a vacuum sealer, plastic containers, dryer sheets, and a digital scale. On the lower shelf of a table in that same room, officers discovered $618,328 bundled in heat-sealed wrap plus another $152,315 in loose currency inside a dresser drawer. Officers seized a black notebook which was used as a "pay/owe" ledger on top of the dresser. Elsewhere in the room, officers found several vacuum sealers and a money counter. Within the master bedroom, officers discovered 13 cell phones,[16] a .45-caliber handgun, two magazines, five rounds of .45-caliber

---

[14] Vargas-Alvarez did not mention Ramirez by name in the call, but instead referred to "Carnaria." A linguist working with the DEA testified that Ramirez was referred to in telephone calls as " 'Carnaria.' "

[15] On that day, law enforcement officers simultaneously executed more than 10 search warrants at locations where members of the DTO had been observed delivering drugs and picking up money.

[16] A total of 23 cell phones were collected at the Rosemere stash house that morning.

ammunition, and a pair of night-vision goggles.  In the kitchen oven, officers found an "Intratec-22" handgun, equipped with a silencer.

Inside the garage, officers searched a BMW, a Toyota 4Runner, and an Acura. The 4Runner had a hidden compartment containing 43 kilos of cocaine and two trays of methamphetamine.  Both the BMW and the Acura also had hidden compartments, but those compartments were empty.

### *f. Subsequent searches of the Rosemere stash house for evidence related to Lopez's kidnapping*

Following the interview with Lopez, officers executed an additional search warrant at the Rosemere stash house on March 21, 2009, in order to look for biological evidence establishing that Lopez had been held there.  At the Rosemere stash house, a crime scene investigator searched for evidence related to a potential kidnapping, such as a hood, duct tape, zip ties, as well as possible bloodstain evidence in the kitchen pantry where Lopez was held.  The investigator found three bloodstains and some used duct tape inside that pantry.  In a trash can, the investigator found a zip tie, a rope, a vitamin water bottle, and a yogurt drink bottle.[17]  Three other zip ties were discovered in a box outside the house.  Inside a box in the garage, the investigator found a roll of unused duct tape and some work gloves.  Also in the garage, the investigator discovered a gray cloth shoe bag.

The evidence collected during the second search at the Rosemere stash house, as well as bloodstains discovered in the trunk of one of the vehicles, was analyzed for DNA. There were bloodstains in the trunk of the BMW, and a DNA test confirmed that it was Lopez's blood.  Lopez's DNA was a match with the DNA found in the bloodstains in the pantry, the trunk, as well as on the shoe bag, the rope, and the zip ties.

---

[17] Lopez testified that Guillermo Velasquez gave him a "[s]trawberry El Mexicano" yogurt.

## 2. *Defense evidence*

After his arrest, Ramirez was interviewed by the DEA. He answered questions during the interview, but did not agree to cooperate with the DEA or testify against other members of the DTO.

Ramirez's daughter, F., who was 10 at the time of trial, testified that in 2009 when she was three years old, she went to the hospital to have surgery. Ramirez and her mother brought her to the hospital and drove home with her afterward.

From 2003 to 2008, Ramirez worked in construction in Sonoma County. Two of his employers during that period testified that Ramirez was reliable, with a good work ethic and good character. Neither of them believed that Ramirez was violent or cruel.

Ramirez's sister testified that Ramirez was married, had two children and his family lived in Windsor from 2002 to approximately 2009. She was "close to [Ramirez]" in 2008 and 2009, and knew that Ramirez "for a period of time" would drive to Los Angeles on a Thursday and return to Windsor on Sunday. The sister recalled that Ramirez's daughter had surgery on March 16, 2009, and that Ramirez was with his family the night before and the day of the surgery. Ramirez had come up from San Jose on March 15, then went back to San Jose on the 17th, after his daughter's surgery. Ramirez's sister testified she did not know anything about Ramirez being involved in drug trafficking and said she believed that he was a good person.

## II.    DISCUSSION

### A.    *Sufficiency of the evidence*

Ramirez argues the prosecution failed to present sufficient evidence at trial to support his convictions for: (1) conspiracy to commit murder (counts 4, 5); and (2) the various possession charges (counts 10-12, 14-16, & 28). Ramirez further argues there was insufficient evidence to support the allegations that he was armed with a firearm in connection with any of the offenses. As discussed below, we disagree.

15

### 1. *Standard of review and applicable legal principles*

To assess the sufficiency of the evidence, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).) This standard applies even when the prosecution relies primarily on circumstantial evidence. (*Ibid.*) The record must disclose substantial evidence to support the verdict such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt, and that evidence must be reasonable, credible, and of solid value. (*Ibid.*) We review the evidence "in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*Ibid.*) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*Ibid.*) The same standard applies under both the California Constitution and the federal Constitution. (*People v. Jimenez* (2019) 35 Cal.App.5th 373, 392.) "It is well settled that 'unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Ghobrial* (2018) 5 Cal.5th 250, 281.)

### a. *Conspiracy to commit murder* (*counts 4*, *5*)

"A criminal conspiracy exists where it is established that there was an unlawful agreement to commit a crime between two or more people, and an overt act in furtherance of the agreement. [Citation.] To sustain a conviction for conspiracy the prosecution must show not only that the conspirators intended to agree but also that they intended to commit the elements of the offense. [Citation.] In proving a conspiracy, however, it is not necessary to demonstrate that the parties met and actually agreed to undertake the unlawful act or that they had previously arranged a detailed plan. The evidence is sufficient if it supports an inference that the parties positively or tacitly came

16

to a mutual understanding to commit a crime.  Therefore, conspiracy may be proved through circumstantial evidence inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy."  (*People v. Prevost* (1998) 60 Cal.App.4th 1382, 1399 (*Prevost*).)  A "conviction of conspiracy to commit murder requires a finding of intent to kill."  (*People v. Swain* (1996) 12 Cal.4th 593, 607 (*Swain*).)

Ramirez claims there was insufficient evidence to establish that he possessed the necessary intent to kill Gonzalez and his mother.  In his view, the prosecution's case, as argued to the jury, was founded entirely on Ramirez's "knowledge" of Vargas-Alvarez's plan to kill Gonzalez and his mother and that Ramirez's "role" in the conspiracy to commit murder was "sharing the intent to complete the purpose of [the DTO] which is selling cocaine."  We disagree that the evidence presented at trial was insufficient to support Ramirez's convictions on these charges.

The conspiracy to kidnap and murder Gonzalez and his mother was established by evidence of conversations between Vargas-Alvarez and Madrigal in early to mid-December 2008, where they discussed kidnapping and murdering Gonzalez and his mother.[18]  This evidence showed that Vargas-Alvarez and Madrigal had the requisite intent to kill, especially as it was clear that both parties could provide evidence against Vargas-Alvarez and the DTO.  The prosecution then introduced evidence linking Ramirez to that conspiracy.

The jury heard ample evidence that Ramirez was directly involved in the DTO starting in 2007, and as Vargas-Alvarez's cousin, he was a "trusted associate" and a member of the DTO's "inner circle."  Ramirez was present when Vargas-Alvarez would talk about the DTO's operational details.  When he first began working with the DTO,

---

[18] Vargas-Alvarez and Madrigal used coded language in these calls, referring to forcibly taking Gonzalez and his mother out to "eat," to the "movies," and on "vacation."

Ramirez was working in the Los Angeles stash house, bringing in the drugs that arrived from Mexico. Beginning in 2008, Ramirez was tasked with transporting large quantities of drugs and cash between Los Angeles and San Jose. Also in 2008, Ramirez agreed to use his name and identification in connection with renting the ranch in Gilroy. Ramirez assisted Vargas-Alvarez in finding the RV the DTO was to use in transporting drugs to Atlanta and took that vehicle to the auto shop to have a hidden compartment installed.

The jury was also told about how drug cartels would murder people who owed them money or threaten their operations and how Madrigal and Luu, both of whom lost money when the stash house was burglarized, had violent reputations. The jury heard testimony that Luu wanted to kill Gonzalez for the burglary of the stash house.

The prosecution also presented evidence that Ramirez was in the room with Vargas-Alvarez and other members of the DTO when Vargas-Alvarez said he believed that Lopez helped Gonzalez with the theft of the stash house and that "they were going to give [Lopez] a lesson, they were going to scare him a little bit." Others in the DTO, including Vargas-Alvarez's brother, urged Vargas-Alvarez to " '[t]each [Gonzalez and Lopez] a lesson so they won't do it again. It's not like it was $100,000, it was two million dollars.' " At that point, the discussion turned to kidnapping Gonzalez and Lopez simultaneously so they would reveal where the money was. Ramirez was present during the sessions as the specifics of the plan came together: Vargas-Alvarez's "brothers or friends in Mexico" would abduct Gonzalez while Vargas-Alvarez, Ramirez, and two others would kidnap Lopez with Luu's assistance.

The jury heard testimony that Vargas-Alvarez spoke with Ramirez in more detail about Lopez's kidnapping, saying that they would beat him, hold him captive to make him fearful and "probably kill him." Vargas-Alvarez told Ramirez in an intercepted phone call to tell a third party not to be around Lopez because "that guy" "is going to go on a vacation to the beach." Vargas-Alvarez obtained a silencer from Luu for the gun in the Rosemere house "[i]n case they needed to use it" on Lopez. Ramirez knew about the

18

gun and the silencer, brought them with him when he went to transport Lopez from the La Strada residence to the Rosemere stash house, and was among those who beat Lopez during his captivity.

Finally, the prosecution introduced an intercepted telephone call between Ramirez and Vargas-Alvarez on March 16—while Lopez was still being held at the Rosemere stash house. In that call, Ramirez gave Vargas-Alvarez an update about his daughter's surgery, but then asked, "what happen[ed] with that guy?" possibly referencing Gonzalez. Vargas-Alvarez replied that it had been "2 days since they left the town, . . . [b]ut supposedly, [he] will arrive early tomorrow morning and tomorrow (unclear statement) [they] will take care of it." Ramirez responded, "No, honestly that shit is just going bad, son of a bitch, [they] mess things up."

There was no direct evidence that Ramirez participated in any discussion of a plan to murder Gonzalez and his mother, but "it is not necessary to demonstrate that the parties met and actually agreed to undertake the unlawful act or that they had previously arranged a detailed plan." (*Prevost*, *supra*, 60 Cal.App.4th at p. 1399.) A "conspiracy may be proved through circumstantial evidence inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." (*Ibid.*)

This is exactly how the prosecution proved the conspiracy to commit murder here. The evidence presented at trial established Ramirez's involvement in a criminal enterprise trafficking large quantities of cocaine and methamphetamine and generating millions of dollars in proceeds. The evidence showed that Ramirez knew the DTO's operations, in that it obtained its drugs from cartels based in Mexico, operated multiple stash houses in California and at least one in Atlanta, and utilized multiple vehicles equipped with hidden compartments to transport drugs and cash. Since Ramirez was part of the plot to kidnap and possibly murder Lopez, and knew of the plot to simultaneously abduct Gonzalez and his mother in Mexico, it is reasonable to presume that he knew

19

Gonzalez, the prime suspect in the burglary, and his mother would or could be murdered as well.

There was certainly evidence presented that supported an alternative theory—i.e., that there was no specific intent to kill anyone but simply a plan to kidnap and assault Lopez, Gonzalez, and Gonzalez's mother in order to make them confess to the burglary and give back the stolen money. The possibility of an alternative explanation is not enough to secure a reversal of the jury's verdict, however. "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon *no hypothesis whatever* is there sufficient substantial evidence to support" ' the jury's verdict." (*Zamudio*, *supra*, 43 Cal.4th at p. 357, italics added.)

Viewing the evidence in a light most favorable to the judgment and "presum[ing] in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence" (*Zamudio*, *supra*, 43 Cal.4th at p. 357), there was substantial evidence to support the jury's verdicts on counts 4 and 5.

### b. *Possession charges*

"To justify a conviction in any case on a charge of possession, it is necessary to prove that the accused knew of the presence of the [contraband] and that the same was under his control." (*People v. Antista* (1954) 129 Cal.App.2d 47, 50.) "Actual or constructive possession is the right to exercise dominion and control over the contraband or the right to exercise dominion and control over the place where it is found. [Citation.] Exclusive possession is not necessary. A defendant does not avoid conviction if his [or her] right to exercise dominion and control over the place where the contraband was located is shared with others." (*People v. Rushing* (1989) 209 Cal.App.3d 618, 622.) "Possession of [contraband] may be proven circumstantially, and possession for even a limited time and purpose may be sufficient." (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 831.) "[C]onstructive possession may be shown by establishing the accused

20

'maintained some control *or right to control* over contraband in the physical possession of another.' " (*Armstrong v. Superior Court* (1990) 217 Cal.App.3d 535, 539.)

In this case, Ramirez was charged in counts 10 through 12, 14 through 16 and 28 with possession of the contraband found inside of the Rosemere stash house and garage on March 18, 2009.

### *i. Corroboration of accomplice testimony*

In challenging the sufficiency of the evidence to support his convictions on the possession offenses, Ramirez argues that some of the evidence presented at trial must be discounted as uncorroborated accomplice testimony. We disagree.

Section 1111 provides that "[a] conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." "When there is sufficient evidence that a witness is an accomplice, the trial court is required on its own motion to instruct the jury on the principles governing the law of accomplices." (*People v. Frye* (1998) 18 Cal.4th 894, 965-966, disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone. [Citations.] It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified. [Citations.] It is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' " (*People v. Valdez* (2012) 55 Cal.4th 82, 147-148.)

In this case, the jury was instructed pursuant to CALCRIM No. 335 that the cooperating witness was an accomplice in the criminal possession offenses, and thus some "slight" independent supporting evidence was required before the jury could credit her testimony as proof of Ramirez's guilt. The fact that Ramirez was found hiding under

21

a bed within the Rosemere stash house when it was raided early in the morning, wearing just his underwear, was sufficient corroboration of his status as a privileged member of the DTO. In addition, Lopez testified that he saw Ramirez during his captivity, further corroborating the cooperating witness's testimony about Ramirez's participation in the DTO's activities beyond merely transporting drugs and cash. It was thus reasonable for the jury to infer that he had at least constructive possession and control of the contraband found in the stash house and garage.

### ii. *Possession of drugs and currency (counts 10, 11, 14)*

During the raid on the Rosemere stash house, law enforcement entered a locked upstairs bedroom and recovered 42 kilograms of cocaine and $770,643 in currency. In the garage of that residence, there were three vehicles equipped with hidden compartments and inside one of those compartments (in a Toyota 4Runner), officers recovered 43 kilograms of cocaine and nearly two pounds of methamphetamine. During the raid, Ramirez was apprehended hiding underneath a bed in the (unlocked) upstairs master bedroom.

Beyond knowing what was found in the stash house and the garage, the jury also knew that Ramirez was Vargas-Alvarez's cousin and was allowed to be in the room when the DTO's operations were discussed. From 2008 onward, he was entrusted with transporting large quantities of drugs and cash between Los Angeles and San Jose.[19] It was not unusual for Ramirez to sleep at the Rosemere stash house. Ramirez assisted Vargas-Alvarez in finding an RV for the DTO to transport drugs in quantity to Atlanta, and further assisted in having a hidden compartment installed in that vehicle. Vargas-Alvarez trusted Ramirez to help him kidnap Lopez, and hold him captive at the stash house for several days.

---

[19] Just before the raid, Ramirez had helped transport approximately 100 kilograms of cocaine from Los Angeles to the Rosemere stash house.

The jury was also informed that, when drugs were delivered to the stash house, it was moved into the upstairs bedroom which was obviously unlocked and accessible during that transfer. While there was no evidence that Ramirez had his own key to that room, Vargas-Alvarez hid a spare key in the stash house "in case somebody else will need it." A cooperating witness testified that "everything in that [stash] house belonged" to Vargas-Alvarez and the DTO, including Ramirez.

With respect to the methamphetamine found in the Toyota, there was testimony that Ramirez sometimes transported drugs and money in that vehicle and, in any event, "[w]e all drove all the cars" used by the DTO. While Ramirez may have principally driven the Acura that was found in the Rosemere stash house garage, the jury was informed that his use of that vehicle was not exclusive. As a result, it was reasonable for the jury to infer that Ramirez had access to and control over every vehicle in that garage, and was aware of what was in the hidden compartments of those vehicles.

Because the jury heard evidence regarding Ramirez's role in the DTO, it was a reasonable inference that he could exercise dominion and control over the contents of the locked bedroom. Ramirez was trusted not just with the knowledge of the stash house's location; he was also permitted to stay in it overnight. He was entrusted with transporting at least some of the drugs and money stored in the stash house from Los Angeles to San Jose. While Ramirez may not have been a manager of the stash house, there was sufficient evidence that he maintained constructive possession of the contents of the locked bedroom and the methamphetamine found in the garage to support his convictions on counts 10, 11, and 14.

### iii. *Possession of false compartments* (*counts 15*, *16*)

Ramirez challenges his convictions on charges of possessing a false compartment in two of the three vehicles—a Toyota 4Runner and a BMW—found in the Rosemere stash house garage.[20]

As discussed above, the jury heard evidence linking Ramirez to all three vehicles in the stash house garage. Ramirez sometimes transported drugs and money in the Toyota and, even if Ramirez principally drove the Acura for that purpose, everyone who transported drugs and cash for the DTO "drove all the cars." In addition, there was testimony that Ramirez arranged for the installation of hidden compartments in the vehicles used by the DTO. It was therefore reasonable for the jury to infer that Ramirez has possession and control over the hidden compartments in each of the vehicles seized at the Rosemere stash house, and there was sufficient evidence to support his convictions on counts 15 and 16.

### iv. *Possession of silencer and assault weapon* (*counts 12*, *28*)

Ramirez argues there was insufficient evidence to establish that he unlawfully possessed the silencer (count 12) and assault weapon (count 28) that were discovered in the oven during the raid on the Rosemere stash house.

At trial, the prosecution introduced evidence that the silencer had been obtained by Vargas-Alvarez as part of the plan to kidnap Lopez and possibly kill him, and that the assault weapon had been acquired to protect the drugs and money stored at the Rosemere stash house. The cooperating witness testified that the weapon and the silencer were stored inside the kitchen stove, which is precisely where officers found them during the raid.

---

[20] Ramirez does not challenge his conviction for possession of a false compartment in the Acura (count 17) as he concedes that this was the vehicle he "routinely used" in transporting drugs and currency for the DTO.

The jury also heard evidence that Ramirez was involved in planning the Lopez kidnapping, was tasked with both assaulting Lopez and bringing the weapon and silencer along when they transported Lopez from the La Strada residence to the Rosemere stash house in the trunk of the BMW. Ramirez was present when the weapon and silencer were stashed inside the oven. The silencer was homemade, in that it was constructed from a metal flashlight cylinder and modified to screw onto the threaded barrel of the firearm.

The jury could reasonably infer that Ramirez knew this was a silencer, given that he was involved in planning Lopez's abduction, captivity, and possible execution.

As for the firearm, the prosecution presented evidence that it fell within the definition of an assault weapon because its barrel had been threaded so that a silencer could be attached and the magazine fit "outside of the pistol grip."[21] Those characteristics were readily observable to anyone who handled the weapon, and the jury heard evidence that Ramirez was supposed to bring the weapon and silencer when he helped transport Lopez to the Rosemere stash house. It is also reasonable to assume that every member of the DTO would be expected to use the weapon, including knowing how to load and fire it, to defend the stash house in case someone attempted to rob it. It was not necessary for the prosecution to prove that Ramirez knew the Intratec-22 was an assault weapon. It is enough to show that he "should have known the firearm had the *characteristics* making it a defined assault weapon." (*In re Jorge M.* (2000) 23 Cal.4th 866, 886, italics added.)

---

[21] Pursuant to section 30515, subdivision (a)(4), an assault weapon includes semiautomatic pistols that have any one of several enumerated features, including "[a] threaded barrel, capable of accepting a . . . silencer" and "[t]he capacity to accept a detachable magazine at some location outside of the pistol grip." (§ 30515, subd. (a)(4)(A), (D).)

Consequently, there was sufficient evidence to support Ramirez's convictions for unlawful possession of a silencer (count 12) and assault weapon (count 28).

### c. *Arming allegations* (*counts 4*, *9*, *10*, *11*)

The jury found true the allegations that Ramirez was armed with a firearm in connection with the conspiracy to murder Gonzalez (count 4), the conspiracy to sell cocaine (count 9), possession of cocaine for sale (count 10) and possession of methamphetamine for sale (count 11).[22] In addition, the jury found true the allegations that Ramirez knew that Vargas-Alvarez was personally armed with a firearm, as defined in section 12022, subdivision (d), in connection with the drug offenses, i.e., counts 9, 10, and 11.

In order to be armed with a firearm for purposes of section 12022, a defendant need not use "a firearm or even carry one on the body. A defendant is *armed* if the defendant has the specified weapon available for use, either offensively or defensively." (*People v. Bland* (1995) 10 Cal.4th 991, 997.) Consequently, "a defendant is armed with a weapon even though it is not carried on his person, when he is aware it is hidden in a place readily accessible to him." (*People v. White* (2016) 243 Cal.App.4th 1354, 1362.)

As discussed above, there was substantial evidence to support the jury's verdicts that Ramirez engaged in a conspiracy to sell cocaine (count 9), possessed cocaine for sale (count 10), and possessed methamphetamine for sale (count 11). Those offenses were ongoing during the period that Ramirez was present at the Rosemere stash house up until his arrest during the raid on March 18. Further, we have already determined that there was substantial evidence to support the jury's verdict that Ramirez possessed the firearm that was in the oven at the Rosemere stash house, meaning that Ramirez had knowledge

---

[22] The arming allegation in connection with count 4 was pursuant to section 12022, subdivision (a)(1), and the arming allegations in connection with counts 9, 10, and 11 were pursuant to section 12022, subdivision (c).

26

of its existence and location.[23]  Because Ramirez knew where the firearm was kept and could have used it, to threaten Lopez or defend the stash house from intruders, there was substantial evidence Ramirez was armed with a firearm during the commission of these offenses.

The same evidence supports the jury's findings that Ramirez knew that Vargas-Alvarez, a principal in these same crimes, was armed when Ramirez committed counts 9, 10, and 11.  As discussed above, the prosecution presented evidence that Vargas-Alvarez was the head of the DTO and, to defend the Rosemere stash house from intruders, acquired the weapon that was found in the oven.

Finally, there was substantial evidence that Ramirez was personally armed with the firearm when he conspired to kill Gonzalez (count 4).  The jury heard evidence that Vargas-Alvarez obtained the Intratec-22 pistol after the theft at the Mission Street stash house and intended to use the weapon, at least initially, to protect the Rosemere stash house from intruders.  As part of the plan to abduct Lopez, hold him captive and possibly kill him, Vargas-Alvarez obtained a silencer for that weapon from Luu.  Ramirez knew of the weapon and was supposed to bring it to the La Strada residence when he and others were sent there to transport Lopez to the Rosemere stash house.

The weapon (assuming it was taken from the oven during Lopez's transportation) was placed back in the oven where it remained until law enforcement raided the stash house on March 18.  Accordingly, it was present throughout Lopez's captivity, during

[23] Ramirez argues that the cooperating witness's testimony regarding Ramirez's knowledge of the weapon, was "inconsistent, contradicted by other evidence, and a self-serving attempt to please the government and secure her time-served sentence."  As discussed above, that testimony was, with slight corroboration, sufficient to support the jury's verdict on the charge that Ramirez possessed the firearm (count 28).  Since accomplice testimony need not be corroborated at all to support arming allegations (*People v. Maldonado* (1999) 72 Cal.App.4th 588, 597), it is clear that the cooperating witness's testimony would also be sufficient to sustain the jury's findings that Ramirez was armed in connection with counts 9, 10, and 11.

27

which Ramirez and the others hoped to coerce information from Lopez about the stolen money, Gonzalez's whereabouts, or Gonzalez's guilt, and was thus an integral part of the plan to kidnap and kill Gonzalez in Mexico. On March 16, 2009, Ramirez spoke to Vargas-Alvarez and appeared to ask about the ongoing efforts in Mexico to abduct Gonzalez, indicating that the conspiracy was ongoing. As a result, there was substantial evidence to support the jury's verdict that Ramirez was armed in connection with the conspiracy to murder Gonzalez (count 4).

### B. *Alternative theory error*

Ramirez argues the jury was improperly instructed that it could find him guilty on both counts of conspiracy to commit murder (counts 4, 5) if it found that those offenses were a natural and probable consequence of Ramirez's participation in the conspiracy to sell cocaine.

The Attorney General contends that California law only prohibits using the natural and probable consequences doctrine to impose liability for the crime of actual murder, not conspiracy to commit murder. Alternatively, the Attorney General argues that any instructional error in this regard was harmless beyond a reasonable doubt.

As discussed below, we agree with Ramirez and are not persuaded that a defendant may be found guilty of conspiracy to commit murder under the natural and probable consequences doctrine.

### 1. *Additional background*

After several days of deliberating, the jury reported that it had reached verdicts on all counts except 4 and 5. The jury requested additional argument from the parties "that more directly links [Ramirez] to the agreement and conspiracy to commit murder of [Gonzalez and his mother]." The jury also asked, "Does being a member, even in the 'inner circle,' of a drug trafficking organization (DTO) make that member liable for all acts, intentions, and plans of any or all of the other members of the DTO? [¶] If a member

28

agrees to a plan and is not aware that the plan includes additional acts, is the member liable for agreeing to this total plan?"

The trial court indicated that defense counsel had requested that the court respond to the jury's questions by "reread[ing], in a modified format, [CALCRIM No.] 417 and I modified 417, I call it instruction 417A." The court explained that the modified instruction "clarif[ied] that the target offense is the conspiracy to sell cocaine and that the non-target offense, the conspiracy to commit murder . . . , it's required that it be a natural and probable consequence of the target offense."

At the same time, however, the defense argued that "the jury should not even be allowed to consider natural and probable consequence as a theory of liability for conspiracy to commit murder" because it would eliminate the necessary element of intent to kill. The trial court overruled the defense objection, finding "no limitation to the natural and probable consequences doctrine that would prevent its application to an inchoate crime, such as conspiracy to commit murder."[24]

Accordingly, the court instructed the jury as follows: "A member of a conspiracy is criminally responsible for the crimes that he or she conspires to commit, no matter which member of the conspiracy commits the crime. [¶] A member of a conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy. [¶] This rule applies even if the act was not intended as part of the original plan. Under this rule, a defendant who is a member of the conspiracy does not need to be present at the time of that act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. [¶] In deciding whether a consequence is natural and probable,

---

[24] The trial court had previously provided the jury with the standard natural and probable consequences instruction.

consider all the circumstances established by the evidence. A member of a conspiracy is not criminally responsible for the act of another member if that act does not further the common plan or is not a natural and probable consequence of the common plan. [¶] To prove that the defendant is guilty of the crimes charged in counts 4 and 5, the People must prove that [1] the defendant conspired to commit the sale of cocaine[;] [2] a member of the conspiracy to sell cocaine committed the crime of conspiracy to commit murder to further the conspiracy to sell cocaine[;] [¶] And [3] conspiracy to commit murder was a natural and probable consequence of the common plan or design of the crime that the defendant conspired to submit[:] conspiracy to sell cocaine."

Following that reinstruction, the parties were allowed to provide supplemental closing argument on this subject. The prosecutor first reviewed the evidence of Ramirez's direct liability for conspiracy to commit murder before turning to why Ramirez would be liable under the natural and probable consequences doctrine. The prosecutor explained that Ramirez conspired to sell cocaine and Vargas-Alvarez conspired to murder Gonzalez and Gonzalez's mother. Under this theory, Ramirez did not need to have the specific intent to kill anyone as long as the conspiracy to commit murder was a natural and probable consequence of someone stealing drugs and a large sum of money from the DTO.

Defense counsel argued that because there was no evidence Ramirez was directly involved in a conspiracy to murder Gonzalez and his mother, the prosecution had to shift to the natural and probable consequences theory. Even then there was no evidence that Ramirez, whose only job was to drive drugs and money around for the DTO, would know that Vargas-Alvarez would plan to murder anyone.

The jury returned to deliberate and, approximately 20 minutes later, indicated that it had reached verdicts on all counts, including counts 4 and 5. It found true the allegation that Ramirez was personally armed with a firearm while conspiring to commit murder as alleged in count 4.

30

### 2. *Applicable law*

"[A] conviction of conspiracy to commit murder requires a finding of intent to kill." (*Swain*, *supra*, 12 Cal.4th at p. 607.) Consequently, "conspiracy to commit murder may not be based on a theory of implied malice. Conspiracy to commit murder may be based only on express malice, i.e., an intent to kill." (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 642.) Because conspiracy to commit murder requires a specific intent to commit first degree murder, it cannot be based on implied malice or as the natural and probable consequence of a conspiracy to commit a lesser offense, and instructions which permit the jury to convict a defendant under those theories are legally incorrect. (*Id*. at pp. 642-645; *Swain*, *supra*, 12 Cal.4th at pp. 602-607; *People v. Chiu* (2014) 59 Cal.4th 155, 158-159, superseded by statute as stated in *People v. Lewis* (2021) 11 Cal.5th 952, 959, fn. 3.)

### 3. *Harmless error*

When a jury is instructed on both a valid and an invalid legal theory—that is, where there is alternative-theory error—we apply the harmless error test drawn from *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*People v. Aledamat* (2019) 8 Cal.5th 1, 3, 7, fn. 3.) Under this standard, we "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[] the error was harmless beyond a reasonable doubt." (*Id*. at p. 13.)

Here, we cannot determine the legal error was harmless beyond a reasonable doubt. After the jury indicated that it was deadlocked on counts 4 and 5, it asked for "a more specific argument" directly linking Ramirez to the agreement to murder Gonzalez and his mother. The jury further asked whether being a member of the inner circle of the DTO made him liable for acts and plans of other group members even if he was unaware of those plans and acts. In response, the trial court gave the modified version of CALCRIM No. 417. During supplemental argument, the prosecutor again addressed the

evidence supporting a theory of direct liability on counts 4 and 5 but acknowledged that this theory "didn't work out." The prosecutor, moving to what he called "plan B," informed the jury it did not have to find that Ramirez personally had an intent to kill or was part of an "agreement to kill," rather it only had to find that a conspiracy to kill was the natural and probable consequence of Ramirez's participation in the conspiracy to sell cocaine. After approximately 20 minutes of further deliberation, the jury found Ramirez guilty on both counts 4 and 5.

The Attorney General's argument that "the evidentiary contrast between the two theories was stark, and weighed heavily in favor of conviction based on appellant's direct participation in the conspiracies" overlooks the fact that the jury was unable to reach a verdict on these charges until after it received the modified version of CALCRIM No. 417 and heard the prosecutor's supplemental argument. Nor do we find it persuasive that the jury found true the allegation that Ramirez was "personally armed" during commission of the conspiracy to murder Gonzalez (count 4). While this finding may be factually inconsistent with a verdict that Ramirez was guilty of conspiracy to commit murder under the natural and probable consequences theory, it does not conclusively establish that none of the jurors relied on a legally incorrect theory in voting to convict Ramirez on counts 4 and 5.

In light of the instructions and the prosecutor's argument, we conclude there is a reasonable likelihood that at least some members of the jury relied on the natural and probable consequences theory to convict Ramirez on counts 4 and 5.[25] Accordingly, Ramirez's convictions on counts 4 and 5 must be reversed and, on remand, the prosecution must be permitted to elect to retry those charges.

---

[25] In fact, the trial court remarked at the sentencing hearing that the "jury reached a guilty verdict as to counts 4 and 5 on a natural and probable consequences theory."

### C. *Instructional error* (*CALCRIM No. 1202*)

Ramirez argues that the version of CALCRIM No. 1202 (aggravated kidnapping) provided to the jury misstated the law because it failed to specify that the item of value a kidnapper sought to obtain must be possessed by a third party. We disagree.

#### 1. *Additional background*

Ramirez was charged in count 1 with aggravated kidnapping in violation of section 209, subdivision (a). There are four variations of this offense, the last of which is kidnapping "to exact from another person any money or valuable thing." (§ 209, subd. (a).) To convict under that theory, the jury must find that there was both "a primary kidnap victim and a secondary victim ('another person')." (*People v. Harper* (2020) 44 Cal.App.5th 172, 192 (*Harper*).) The prosecution requested that the court instruct the jury with CALCRIM No. 1202 in relation to count 1.

Prior to issuing the jury instructions, the trial court noted that CALCRIM No. 1202 as written failed to make clear that there must be another person, besides the kidnap victim, who possessed the money or item of value sought by the kidnappers. The parties discussed amending the instruction in various ways but each variation was judged more confusing than the original.

Ultimately, the parties agreed that the prosecutor would not "argue in any way that the purpose of the kidnapping was to get something valuable from anyone other than another person," i.e., not from Lopez himself. Defense counsel agreed with that approach, reserving the right to object to the prosecution's argument or seek further instruction if the prosecution failed to comply.

Accordingly, the trial court issued CALCRIM No. 1202 as follows, in relevant part: "The defendant is charged in count 1 with kidnapping for the purpose of ransom, reward, extortion or getting money or something valuable that resulted in bodily harm or exposure to a substantial likelihood of death, in violation of Penal Code section 209(a). [¶] To prove that the defendant is guilty of this crime, the People must prove that[:]

[1.] The defendant kidnapped, abducted, seized, confined, concealed, carried away, inveigled, enticed or decoyed another person; [2.] The defendant held or detained the other person; [3.] The defendant did so for ransom, for reward, to commit extortion, or to get money or something valuable; [4.] The other person did not consent to being kidnapped, abducted, seized, confined, concealed, carried away, inveigled, enticed or decoyed; and [5.] The defendant did not actually and reasonably believe that the other person consented to being kidnapped, abducted, seized, confined, concealed, carried away, inveigled, enticed or decoyed." The instruction further advised that "[t]he kidnap victim may also be the person from whom the defendant wishes to extort something." It explained that "[s]omeone intends to commit extortion if he . . . intends to [(1)] obtain a person's property with the person's consent; and [(2)] obtain the person's consent through the use of force or fear."

The trial court also instructed with CALCRIM No. 1203, kidnapping for robbery, specifying that it applied to count 2.

### 2. *Forfeiture and invited error*

The Attorney General argues that Ramirez has forfeited this argument by agreeing below to the use of former CALCRIM No. 1202, or has invited the error. We disagree. "[I]t is well settled that no objection is required to preserve a claim for appellate review that the jury instructions omitted an essential element of the charge." (*People v. Mil* (2012) 53 Cal.4th 400, 409.) Furthermore, section 1259 provides that an appellate court may "review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." The record is clear that both the defense and the prosecution recognized that former CALCRIM No. 1202 was problematic as written but were unable to craft a satisfactory amendment while in the midst of trial. We will not find forfeiture under such circumstances.

For the same reasons, we are not persuaded that this falls under the rubric of invited error. That rule is designed to prevent a defendant from gaining reversal on appeal because of an error he or she intentionally caused the trial court to make. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49.) There is no suggestion that defense counsel agreed to the use of former CALCRIM No. 1202 for any reason other than the failure of both counsel and the court to draft alternative language that was less confusing.

### 3. *Applicable law*

For claims of instructional error, "[a]n appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) Further, the reviewing court inquires " ' " ' "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " ' " (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1320 (*Castaneda*); *People v. Solomon* (2010) 49 Cal.4th 792, 822 [" 'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant.' "].)

" ' "In conducting this inquiry, we are mindful that ' "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." ' " ' " (*Castaneda*, *supra*, 51 Cal.4th at p. 1321.) Thus, " '[t]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " (*People v. Carrington* (2009) 47 Cal.4th 145, 192.) "The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury." (*People v. Young* (2005) 34 Cal.4th 1149, 1202.) " ' "Additionally, we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." ' " (*Castaneda*, *supra*, at p. 1321.)

As discussed above, when a jury is instructed on both a valid and an invalid legal theory—that is, where there is alternative-theory error—we apply the harmless error test drawn from *Chapman*, *supra*, 386 U.S. 18, and "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[] the error was harmless beyond a reasonable doubt." (*Aledamat*, *supra*, 8 Cal.5th at p. 13.)

### 4. *Harmless error*

Section 209, subdivision (a) describes "four different types of aggravated kidnapping: (1) for ransom; (2) for reward; (3) to commit extortion; and (4) to exact from another person any money or valuable thing." (*People v. Ibrahim* (1993) 19 Cal.App.4th 1692, 1696.) "For the first three types, the kidnap victim may be the same person as the person who is being extorted or from whom the ransom or reward is sought. [Citations.] However, for the fourth type, there must be both a primary victim (the kidnap victim) and a secondary victim from whom the defendant seeks to exact money or something valuable." (*People v. Stringer* (2019) 41 Cal.App.5th 974, 981-982.)

In the present case, the prosecution proceeded under the third and fourth types of aggravated kidnapping on count 1, i.e., that Lopez was kidnapped to force him to return whatever stolen money or drugs he still possessed (kidnapping for extortion), and Lopez was kidnapped to force him into providing information that would help Vargas-Alvarez and the DTO recover money from Gonzalez (kidnapping to exact money or something of value from another).

As another court has noted, "CALCRIM No. 1202's description of the fourth type of aggravated kidnapping is incomplete" (*Harper*, *supra*, 44 Cal.App.5th at p. 192) because it does not make clear that "the defendant must act for the purpose of exacting money or something valuable *from another person*, that is, from a person other than the

36

kidnap victim." (*Id*. at p. 193.) We agree that former CALCRIM No. 1202,[26] which was the version used at trial and which the parties were unable to amend to their satisfaction, fails to make clear that there must be a third person—distinct from the kidnap victim—from whom the defendant is seeking to exact money or something valuable, in order for a jury to convict a defendant under the fourth type of aggravated kidnapping described in section 209, subdivision (a). As we describe below, however, the inadequacy of the instruction is of no help to Ramirez here and, under *Chapman*, the error was harmless beyond a reasonable doubt.

Both the evidence presented at trial, as well as the prosecutor's arguments, left no doubt that Lopez was kidnapped in order to help the DTO recover the proceeds of the stash house theft from Gonzalez. The plan was to simultaneously abduct Gonzalez and Lopez because Vargas-Alvarez and the other members of the DTO suspected that they were both involved in the theft. In fact, Gonzalez was always the principal suspect, as he had previously managed the stash house that was hit and was the only person who failed the lie detector test that Vargas-Alvarez had everyone take. In addition, Gonzalez was the one who relocated to Mexico and was observed spending lots of money in that country.

The prosecutor's final argument tracked with this evidence, explaining that Lopez had been kidnapped, beaten, and held captive in a closet with his hands and ankles tied, so that he would disclose information leading to the recovery of the DTO's money from Gonzalez. The prosecutor explained that liability for count 1 could be premised upon a kidnapping carried out in order to "get money or something valuable *from a third person*," (italics added) stating: "[I]t doesn't have to be [Lopez] as the victim of the

---

[26] CALCRIM No. 1202 has been amended since *Harper*, as it now states that the jury must find that the defendant kidnapped the victim "for ransom[,]/ [or] for reward[,]/ [or] to commit extortion[,]/ [or] *to get from a different person* money or something valuable." (CALCRIM No. 1202 (2021), italics added.)

extortion. . . . It could be [Gonzalez], or they could be kidnapping [Lopez] in count 1 with the purpose of gaining information from him that would lead to them getting the money and the meth from [Gonzalez]. [¶] That's that last part. To get money or something valuable from another person." This argument was consistent with the evidence presented, and would have clarified any latent juror uncertainty about how to apply CALCRIM No. 1202.

For the same reasons, the evidence and arguments were just as clear on the third theory set forth in section 209, subdivision (a), namely that Ramirez kidnapped Lopez in order to extort the return of any stolen money or drugs in his possession. While it was clear that Gonzalez was the principal suspect in the stash house theft, Vargas-Alvarez believed that Lopez was an accomplice, which is why they repeatedly asked Lopez where the money was throughout his captivity and beatings. The prosecutor made that point during final argument, explaining that these facts established that Ramirez kidnapped Lopez for extortion: "[U]sing force or fear but this time they're taking it with the person's consent. 'Give me the damn money and the meth. Okay, okay, okay. I'll give it to you. I'll tell you where it is.' That's kidnap[ping] for the purpose of extortion."

In addition, the trial court clarified for the jury in response to a question that "Counts 1 and 2 charge different crimes" with different elements. Following this clarification, the jury convicted Ramirez on each crime separately. On this record, it cannot be reasonably inferred that the jury nonetheless mistakenly believed that the two crimes were coextensive.

As a result, the record does not support Ramirez's claim that the jury may have relied on an incorrect theory in convicting Ramirez of aggravated kidnapping on count 1.

**D**. *Response to jury question*

In a related claim, Ramirez argues the trial court erred in answering the jury's question about the difference between the robbery aspect of kidnapping for robbery (count 2) and the aggravated kidnapping element of "getting something valuable"

38

(count 1). In his view, the trial court's response should have referenced the evidence presented at trial, rather than simply pointing the jury back to the instructions detailing the elements of the two crimes. We disagree.

### 1. *Additional background*

During deliberation, the jury sent a note requesting "clarification on count 2 and how it differs from count 1. How does robbery in count 2 differ from 'getting something valuable' in count 1?" With the parties' agreement,[27] the trial court wrote in response: "Counts 1 and 2 charge different crimes. The elements of each offense are different. Please refer specifically to Instructions 1202, 1203 and 1600 for the elements of these offenses. Also, please see instruction 3515. [¶] Please re-read these Instructions in their entirety. If you still have a question, please send another note to me with a more specific question." The jury subsequently sent a note regarding count 2, asking: "Is the charge the 'intent' to rob (Instruction 1203) or did they actually have to carry out the robbery (Instruction 1600). Is the 'robbery' considered to be the motorcycle and/or cell phone and/or the lost money/[drugs]."

As discussed above, former CALCRIM No. 1202 set forth a theory of liability for aggravated kidnapping that required the kidnapping to be performed "to get money or something valuable." CALCRIM No. 1203 addresses kidnapping for robbery (§ 209, subd. (b)), and informed the jury that the kidnapping must be performed with the "intent[] to commit robbery." The jury was instructed with CALCRIM No. 1600 that "robbery" is defined as a person permanently taking "property that was not his own," against the will

---

[27] The parties' discussion of this note, along with other notes from the jury, took place in chambers without a reporter present. The following day, the trial court stated on the record that it had "met and conferred with the attorneys . . . in crafting" responses to the jury with respect to every note it had sent out over the preceding two days. Counsel for both parties then affirmed that they "agree[d] with all the responses" that the court had "given to the jury so far."

of the victim and by using force or fear, while the property was possessed by and in the "immediate presence" of the victim. Finally, pursuant to CALCRIM No. 3515, the trial court instructed the jury that "[e]ach of the counts charged in this case is a separate crime," must be considered separately, and must be the subject of a separate verdict.

### 2. *Forfeiture*

The Attorney General again argues that Ramirez has forfeited this issue by not objecting to the trial court's response at trial. Because Ramirez's argument is intertwined with his claim of error relating to the use of former CALCRIM No. 1202 and implicates his substantial rights (§ 1259), we do not think the claim is forfeited and will resolve it on the merits.

### 3. *Applicable law*

Section 1138 provides that when the jury "desire[s] to be informed on any point of law arising in the case . . . the information required must be given." "Where the original instructions [to the jury] are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) In responding to a request for further instruction, the court "must at least *consider* how it can best aid the jury . . . [and] should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*Ibid.*)

"When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner." (*People v. Wilson* (2008) 44 Cal.4th 758, 803.) "We of course presume 'that jurors understand and follow the court's instructions.' " (*Ibid.*)

As discussed above, the trial court and parties recognized that former CALCRIM No. 1202 was deficient, but ultimately agreed they could not craft a satisfactory

clarification. The agreed-upon solution was to give the instruction without any change, with the proviso that the prosecution would not "argue in any way that the purpose of the kidnapping was to get something valuable from anyone other than another person," i.e., not from Lopez himself.

Ramirez does not posit that the jury was misinstructed on the definition of robbery (CALCRIM No. 1600). CALCRIM No. 1600 made clear that robbery requires taking the property directly from the victim's possession or his "immediate presence." In a subsequent note, the jury asked if kidnapping for robbery required a completed robbery or just the intent to rob the victim and further asked if the " 'robbery' " was Lopez's "motorcycle and/or the cell phone and/or lost money/[drugs]." The trial court's response was that CALCRIM No. 1600 "defines the crime of robbery and refers to the term 'property.' "

The prosecutor explained to the jury the distinction between kidnap for robbery (count 2) and kidnap for extortion or to get money or something valuable from another person (count 1). As to kidnap for robbery, the prosecutor said that robbery is taking something from another by force or fear from their "immediate presence." In this case, the kidnappers "don't know where the money and the meth is but they intend to kidnap [Lopez] and get it back by any means. . . . [¶] . . . One of those means could be that they think [Lopez] is hiding it at his house or a storage facility but he's not giving it up, so they take him to that location and they beat him and take the money and the meth. That's kidnap for robbery."

The prosecutor then contrasted that scenario with the third type of aggravated kidnapping, kidnap for extortion, in which the kidnappers "again us[e] force or fear but this time they're taking it with the person's consent. 'Give me the damn money and the meth. Okay, okay, okay. I'll give it to you. I'll tell you where it is.' That's kidnap for the purpose of extortion."

41

Finally, the prosecution explained that there was an additional theory of aggravated kidnapping, in which Ramirez and the others kidnapped Lopez to get money or something valuable from another, specifically Gonzalez. "It could be another person that could be the victim of the extortion. It could be [Gonzalez], or they could be kidnapping [Lopez] in count 1 with the purpose of gaining information from him that would lead to them getting the money and the meth from [Gonzalez]."

The prosecutor's arguments made clear the distinctions between the different counts. In addition, the jury's subsequent note to the court regarding count 2 indicated its understanding that it was Lopez's property, specifically his "motorcycle and/or the cell phone and/or the lost money/[drugs]" that was the target of the intended robbery. Finally, unlike counts 4 and 5, there is no indication that the jury was unable to reach a verdict on counts 1 and 2, indicating that it was confused about the applicable law.

Between the prosecutor's argument and the jury instructions referenced by the trial court in its response to the jury's question, there was no reasonable likelihood that the jury was misled about the difference between kidnapping for extortion and kidnapping for robbery.

### E. *Instructional error* (*CALCRIM No. 1203*)

Ramirez also argues the trial court erred by adding a pinpoint instruction to CALCRIM No. 1203, describing kidnapping for robbery, which stated that "[t]he kidnapping victim need not be the robbery victim." According to Ramirez, there was no factual basis for this language because the jury could have relied on it to find that Gonzalez was the robbery victim despite the fact that he was in Mexico. We disagree.

#### 1. *Additional background*

Before instructing the jury, the trial court indicated that the parties had discussed CALCRIM No. 1203, and "the D.A. proposed a few pinpoints as to that instruction. One of them is that the kidnapping victim need not be the robbery victim. [¶] He cited [(*People v. Laursen* (1972) 8 Cal.3d 192, 200, fn. 7)]. I'm giving that language, there is

42

no objection." Accordingly, the trial court instructed the jury with CALCRIM No. 1203, adding the sentence requested by the prosecution.

### 2. *Forfeiture*

As before, the Attorney General argues that Ramirez has forfeited this issue by not objecting to the pinpoint instruction. Because Ramirez's argument is intertwined with his other claims of error relating to the kidnapping instructions (see *ante*) and implicates his substantial rights (§ 1259), we do not think the claim is forfeited and will address it on the merits.

### 3. *Factual basis for instruction*

"A trial court has a sua sponte duty to 'instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case.'" (*People v. Blacksher* (2011) 52 Cal.4th 769, 845-846.)

The language added to CALCRIM No. 1203 was consistent with established law on kidnapping for robbery. Section 209, subdivision (b)(1), provides that any "person who kidnaps or carries away an individual to commit robbery, . . . shall be punished by imprisonment in the state prison for life with the possibility of parole." Nowhere in the statutory language, however, is there a mandate that the kidnapping victim be the robbery victim and, in fact, the statute makes it a crime to "kidnap[] or carr[y] away *an* individual to commit robbery," meaning that the victim of the crime of kidnapping for the specific intent to rob need not be the same person who is the object of the robbery itself. "A defendant may be convicted under section 209, subdivision (b), even when the kidnapping victim is not the victim (or intended victim) of the robbery." (*People v. Davis* (2005) 36 Cal.4th 510, 566, fn. 19; see also *People v. Zurica* (1964) 225 Cal.App.2d 25, 32 ["Penal Code section 209, which prescribes the offense of kidnaping for the purpose of robbery does not require that the robbery and kidnaping must relate to the same person."].)

43

The evidence presented at trial supported the theory that Vargas-Alvarez kidnapped Lopez not simply to get information leading to Gonzalez. No one in the DTO knew what happened to the stolen money and drugs, but suspected that Gonzalez *and* Lopez were both involved and that Lopez might know where it was or who might be keeping it hidden. The prosecutor made precisely that argument to the jury, stating that "they don't know where the money and meth is but they intend to kidnap [Lopez] and get it back by any means."

Ramirez posits that, pursuant to the evidence, Gonzalez was the only conceivable robbery victim besides Lopez and, because of geography, it was legally impossible for the DTO to have robbed Gonzalez. This ignores the fact that the kidnappers repeatedly questioned Lopez about where the money was and went so far as to threaten his fiancée if he did not give them what they wanted.

Based on the evidence presented at trial, there was a sufficient legal and factual basis for the court to instruct the jury with the modified version of CALCRIM No. 1203.

### *F*. *Expert testimony*

Ramirez next argues that portions of DEA expert witness Anthony Herrera's testimony should have been excluded as exceeding the permissible scope of expert evidence specifically where Herrera testified regarding "the mental state and intent of the speakers during intercepted conversations." Alternatively, if this court finds the issue forfeited due to a failure to object below, he contends his trial counsel was constitutionally ineffective.

#### *1*. *Additional background*

Herrera, a DEA special agent, helped run the investigation into the DTO. Herrera had worked for the DEA for over nine years, had received specialized education about drug trafficking crimes and related investigations, and possessed knowledge of the practices of Mexican drug cartels. Herrera also testified regarding his experience with wiretaps and wiretap-based investigations, specifically his experience "deciphering coded

44

communication" intercepted on wiretaps. While with the DEA, Herrera had been involved in more than 500 narcotics investigations, over 100 of which involved wiretaps.

At the outset of his testimony, Herrera described a December 4, 2008, conversation between Vargas-Alvarez and Madrigal: "[Vargas-Alvarez] is telling [Madrigal] that they're going to need to take action against [Gonzalez] and his mom because his mom knows what's going on." There was no defense objection to this testimony. The following exchange ensued:

"Q. When you say take action against [Gonzalez], what do you mean? What kind of action are you talking about that you believe [Vargas-Alvarez] is telling [Madrigal] it's time to do?

"A. It looks like they're trying to conduct a kidnapping, maybe force a confession out of him. That's what the contents of this call—and calls later down the road I'm sure we will go through, but it appears that he's trying to have this guy [Gonzalez] in Mexico kidnapped for the purpose of exacting or extracting a confession out of him or trying to figure out where his money is."

As Herrera offered additional interpretations of coded language in the intercepted calls, Ramirez's counsel objected that (1) the testimony lacked foundation, (2) the testimony was speculative, and (3) that the testimony was not a proper subject of expert opinion since the jurors were just as qualified to interpret what was being said. Defense counsel agreed that Herrera could offer expert testimony as to the meaning of terms related to narcotics trafficking, but any references to acts of violence could be readily understood by the jury.

The trial court sustained the objection, subject to the prosecutor laying further foundation about Herrera's relevant expertise in "talking about what code words might be for acts of violence." The prosecutor elicited further foundational information from Herrera about his knowledge of Mexican drug cartels, their organization, history and operational patterns, and their methods and criminal activities within California.

45

Herrera testified that drug traffickers engage in "extortion, bribery, kidnapping, murder, intimidation, money laundering" as part of their operations and routinely use coded language to discuss their criminal activities as well as murder and kidnapping.

Following voir dire, Ramirez opposed Herrera's qualification as an expert only on the topic of "associated illegal activities." The trial court, however, designated Herrera as an expert in "the manufacture, importation, distribution and sale of cocaine, the same for methamphetamine; the history, organizational structure, operation and communications of Mexican drug cartels; and the interpretation of coded narcotics traffic communications and associated illegal activities such as violent crimes on wiretap calls." The court found there was "a sufficient basis" for Herrera's expert testimony about his interpretation of coded language, but Herrera would not be permitted to opine what the speaker on a call "was thinking" when speaking in "plain language," because such testimony would be grounded in speculation. The attorneys would be able to argue to the jury what the speakers meant, or jurors could draw their own conclusions. Before Herrera returned to the witness stand, the court instructed the jury with CALCRIM No. 332 on evaluating expert witness testimony.

### 2. *Forfeiture*

The Attorney General argues that Ramirez has forfeited this claim of error by failing to specifically object to the instances where he contends that Herrera impermissibly testified as the intent or mental state of the individuals speaking on certain intercepted phone calls. We agree. An appellate court will not review questions relating to the admissibility of evidence in the absence of a timely and specific objection to that evidence below. (*People v. Edwards* (2013) 57 Cal.4th 658, 709.) While Ramirez initially objected to Herrera's testimony interpreting the intercepted phone calls as speculative and lacking foundation, he did not renew those objections after the prosecutor laid a further foundation through voir dire or at the time the specific testimony about which he now complains was received.

46

However, even were we to assume that Ramirez's initial objections were sufficient to preserve his claims, we conclude they are without substantive merit.[28]

### 3. *Applicable law*

Expert testimony is admissible when related to a "subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) To qualify as an expert, the witness must have "special knowledge, skill, experience, training, or education sufficient to qualify" the witness as an expert on the subject to which his or her testimony relates. (Evid. Code, § 720, subd. (a).) We generally review the trial court's determination that a witness qualifies as an expert for abuse of discretion. (*People v. Jones* (2013) 57 Cal.4th 899, 949.)

### 4. *No abuse of discretion*

In response to Ramirez's objections to Herrera's testimony interpreting what Vargas-Alvarez and others meant in the intercepted phone calls, the prosecution laid a foundation for that testimony. Herrera had participated in over 500 drug investigations in his career. More than 100 of those investigations involved wiretaps and, in most of those investigations, the suspects spoke in coded language about their criminal activities. In decoding the suspects' language in these conversations, Herrera relied on the context of the calls within the scope of the larger investigation. Herrera's extensive experience in investigating international drug trafficking rings, which included listening to wiretaps and deciphering the coded language suspects used to discuss their criminal activities, was well beyond the common experience of jurors. (See Evid. Code, § 801, subd. (a).)

As Herrera was directly involved in the investigation of the DTO, the intercepted conversations about which he testified were "case-specific facts" as defined in *People v.*

---

[28] We therefore do not address Ramirez's alternative argument that trial counsel was constitutionally ineffective because there is no reasonable probability Ramirez would have obtained a more favorable result had counsel objected below. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 694.)

*Sanchez* (2016) 63 Cal.4th 665, 676. Accordingly, he could proffer "an opinion about what those facts may mean." (*Ibid.*) Given his extensive experience, the trial court did not abuse its discretion in finding he was qualified to first opine that the speakers on certain intercepted telephone calls used coded language, and second, offer his interpretation of what that coded language actually meant. (See *People v. Champion* (1995) 9 Cal.4th 879, 924 [use of experts with knowledge of and experience with gang terminology to explain same to jury is "not uncommon"].)

We are not persuaded that, as Ramirez suggests, Herrera's testimony offered impermissible opinion on the speakers' intent or guilt. His testimony was limited to his interpretation of what the speakers actually meant when they referred to taking someone to "eat," to a "movie," or "on vacation." At no time did Herrera offer an opinion as to a specific intent to either enter into a conspiracy or to perform any elements of the charged offenses.

### 5. *Harmless error*

If Herrera's testimony was received in error, it was harmless. In general, "the application of ordinary rules of evidence . . . does not implicate the federal Constitution, and thus we review allegations of error under the 'reasonable probability' standard of [*People v. Watson* (1956) 46 Cal.2d 818, 836-837]." (*People v. Marks* (2003) 31 Cal.4th 197, 227.)

Herrera's testimony related to the conspiracy and aggravated kidnapping counts, but there was ample direct evidence supporting those charges from Lopez and the cooperating witness. The cooperating witness testified about the conspiracies, the motives and planning by Vargas-Alvarez and the other members of the DTO, including Ramirez. Lopez testified that Vargas-Alvarez principally suspected Gonzalez, but believed Lopez also might have possession of some of the stolen property. Even without Herrera's testimony regarding the intercepted telephone calls and what the speakers were actually discussing, there was sufficient evidence to support the jury's verdicts on

conspiracy and kidnapping. Finally, Ramirez had the opportunity to cross-examine Herrera, which allowed the jury to evaluate the credibility of Herrera's opinions themselves and reject those opinions if it found them suspect.

### G. *Review of wiretap applications*

Ramirez challenges the trial court's denial of his two motions to traverse and quash wiretap authorizations, and to suppress the evidence derived from those wiretaps. As discussed below, we conclude that the trial court properly denied Ramirez's motions.

#### 1. *Additional background*

In December 2008, February 2009, and March 2009, the superior court authorized three wiretaps on target phones associated with the DTO. DEA Special Agent Patrick Donlin filed a lengthy declaration in support of the wiretap applications. In his declaration, Donlin asserted that probable cause existed to believe that "the wire and cellular telephone communications to be intercepted will tend to establish the guilt and involvement" of the identified individuals "in the possession, sales, distribution and manufacturing of methamphetamine and/or cocaine."

Donlin believed that the target subjects were using their phones to facilitate the ongoing DTO. He described what police knew about the DTO by detailing Vargas-Alvarez's involvement in drug trafficking beginning in 2003. In 2003, DEA agents had obtained a wiretap on a phone being used by Fernando Ayala, "a large-scale, Los Angeles-based cocaine trafficker." The agents intercepted two calls from Vargas-Alvarez to Ayala offering to "purchase 50-100 kilograms of cocaine." In December 2004, Arizona police stopped a silver BMW and, after a canine unit alerted to the presence of narcotics, the officers discovered a hidden compartment in the vehicle. The vehicle was registered to one of Vargas-Alvarez's relatives and further investigation revealed that a second BMW was purchased at the same dealership on the same day by Vargas-Alvarez (using an alias). The purchasers paid $110,000 in cash for the two vehicles.

In 2006, one of Vargas-Alvarez's brothers, Juan, was arrested as part of a DEA sting operation. Juan gave an undercover officer the keys to his pickup truck and the officer, who had previously been given $900,000 to obtain 400 kilograms of cocaine, was tasked with returning the truck and the cocaine to Juan. After the cocaine was loaded into the truck, the officer drove it to the agreed upon location and left it in a parking lot, with the keys hidden on the floorboard. Officers observed Juan retrieve the keys and drive away. He was then stopped by the CHP and arrested. A search of the cell phones in his possession showed that Juan was in contact with Vargas-Alvarez shortly before and after he got into his truck.

In a section of the wiretap application concerning "Necessity and Exhaustion," Donlin described other investigative techniques "which have been used or have been considered in this investigation to date," including: use of undercover agents and confidential sources, physical visual surveillance, search/arrest warrants, pen registers and analysis of toll records, interviews of suspects in custody, consensual recordings, trash searches, analysis of financial records, and pole cameras. Donlin concluded that these efforts had not succeeded to date and were unlikely to succeed.

In January and March 2009, the trial court ordered that the wiretap applications and supporting documentation be sealed pursuant to sections 629.64 and 629.66.

On September 24, 2010, Ramirez moved to suppress the evidence obtained from the wiretaps, arguing that the redacted materials supporting the initial wiretap (No. 08-13) did not establish probable cause and the subsequent wiretaps (Nos. 09-01, 09-02) as well as all evidence seized in this case were thus " 'fruit of the poisonous tree.' " In opposition, the prosecutor urged the trial court to conduct an in camera hearing during which it could review the sealed declarations and examine any witnesses it deemed necessary before ruling on the motion.

At a subsequent hearing in March 2011, the trial court ruled that, after conducting an in camera review and taking testimony from "agents and/or informants as necessary,"

50

it found good cause to limit disclosure to the defendants due to the "possibility of violence or retaliation to the confidential informants and/or their families, if any." However, it also found that certain specified portions of the redacted affidavits could be safely disclosed and ordered that the prosecution do so. The trial court also denied Ramirez's motion to suppress finding that "the applications set forth [sufficient] probable cause" to support the wiretap authorizations.

After several months, Ramirez moved to traverse and quash the wiretap authorizations, again seeking to have the supporting documents unsealed. The trial court indicated that it would conduct an in camera review as it "deem[ed] appropriate" to address the motion and again invited counsel to submit questions that could be posed to witnesses at the in camera hearing.

The trial court denied the motion in a written order dated July 27, 2012. In its order, the court stated that it held an in camera hearing on the motion during which it called DEA agents and one or more confidential informants and "asked some or all of the questions" submitted by counsel. The court concluded that the "wiretap applications do not include false statements made knowingly and intentionally or with reckless disregard for the truth," and therefore there was no "reasonable probability that [Ramirez] would prevail on a motion to traverse." The court also found that the facts set forth in the sealed and unsealed documents "provided probable cause to believe the target subject was in the business of narcotics sales, the wiretaps would intercept communications regarding narcotics sales, and the target subject would be communicating through the intercepted lines." The court concluded that "normal investigative procedures were unlikely to succeed and would have jeopardized the ongoing investigation, and therefore the wiretaps were necessary to investigate the target subject's criminal enterprise." The court restated its previous determination that the documents were properly sealed and "must remain so."

## 2. *Applicable legal principles*

"In general, California law prohibits wiretapping." (*People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1195; § 631.) A court may authorize a wiretap if the application contains facts showing that "there is probable cause to believe that an individual has committed, is committing, or is about to commit one or more of the listed crimes (§ 629.52, subd. (a)); there is probable cause to believe that communications concerning the illegal activities will be obtained through that interception (§ 629.52, subd. (b)); there is probable cause to believe that the communications device will be used by the person whose communications are to be intercepted (§ 629.52, subd. (c)); and '[n]ormal investigative procedures have been tried and have failed or reasonably appear either to be unlikely to succeed if tried or to be too dangerous' (§ 629.52, subd. (d) . . .)." (*People v. Leon* (2007) 40 Cal.4th 376, 384.)

Section 1534, subdivision (a) specifies that the contents of a search warrant, including the supporting affidavit, become public record once the warrant is executed and returned. Recognizing the need in some cases to protect the identity of a confidential informant, the California Supreme Court laid out the procedures for trial courts to follow to determine whether some portion—or even the entirety—of a search warrant affidavit may remain sealed. (*People v. Hobbs* (1994) 7 Cal.4th 948, 971-975 (*Hobbs*).) "The procedures outlined in *Hobbs* to protect privileged information apply not only to search warrants, but also to wiretap authorization orders." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1054 (*Sedillo*).) On appeal, we review the trial court's rulings for abuse of discretion. (*Hobbs*, *supra*, at p. 976; *Sedillo*, *supra*, at p. 1055.)

"On a properly noticed motion by the defense seeking to quash or traverse the search warrant, the lower court should conduct an in camera hearing pursuant to the guidelines set forth in [Evidence Code] section 915, subdivision (b), and this court's opinion in [*People v.*] *Luttenberger* [(1990)] 50 Cal.3d [1,] 20-24." (*Hobbs*, *supra*, 7 Cal.4th at p. 972.) "It must first be determined whether sufficient grounds exist for

52

maintaining the confidentiality of the informant's identity. It should then be determined whether the entirety of the affidavit or any major portion thereof is properly sealed, i.e., whether the extent of the sealing is necessary to avoid revealing the informant's identity." (*Ibid.*)

"If the affidavit is found to have been properly sealed, and the defendant has moved to traverse the warrant, the court should then proceed to determine whether the defendant's general allegations of material misrepresentations or omissions are supported by the public and sealed portions of the search warrant affidavit . . . . Generally, in order to prevail on such a challenge, the defendant must demonstrate that (1) the affidavit included a false statement made 'knowingly and intentionally, or with reckless disregard for the truth,' and (2) 'the allegedly false statement is necessary to the finding of probable cause.' " (*Hobbs*, *supra*, 7 Cal.4th at p. 974.) "If the trial court determines that the materials and testimony before it do not support defendant's charges of material misrepresentation, the court should simply report this conclusion to the defendant and enter an order denying the motion to traverse." (*Ibid.*)

"[I]f the affidavit is found to have been properly sealed and the defendant has moved to quash the search warrant [citation], the court should proceed to determine whether, under the 'totality of the circumstances' presented in the search warrant affidavit . . . , there was 'a fair probability' that contraband or evidence of a crime would be found in the place searched pursuant to the warrant. [Citations.] In reviewing the magistrate's determination to issue the warrant, it is settled that 'the warrant can be upset only if the affidavit fails as a matter of law . . . to set forth sufficient competent evidence supportive of the magistrate's finding of probable cause, since it is the function of the trier of fact, not the reviewing court, to appraise and weigh evidence when presented by affidavit as well as when presented by oral testimony.' " (*Hobbs*, *supra*, 7 Cal.4th at p. 975.) Similarly, "[a] wiretap must be supported by a finding of probable cause, necessity, and minimization." (*Sedillo*, *supra*, 235 Cal.App.4th at p. 1055.) "If the court

53

determines, based on its review of all the relevant materials, that the affidavit . . . furnished probable cause for issuance of the warrant . . . [citation], the court should simply report this conclusion to the defendant and enter an order denying the motion to quash." (*Hobbs*, *supra*, at p. 975.) "In all instances, a sealed transcript of the in camera proceedings, and any other sealed or excised materials, should be retained in the record along with the public portions of the search warrant application for possible appellate review." (*Ibid.*) On appeal, we review the trial court's rulings for abuse of discretion. (*Id.* at p. 976; *Sedillo*, *supra*, at p. 1055.)

### 3. *Analysis*

Ramirez has asked that this court independently review the sealed materials related to his motions to unseal, quash, and traverse the wiretap authorizations as well as his motion to suppress the wiretap evidence. The Attorney General did not object to this request.

We have reviewed the sealed and public portions of the wiretap affidavits. We conclude that the court properly ordered the sealed portion of the transcript to remain sealed to protect the identity of the confidential informant(s). (*Hobbs*, *supra*, 7 Cal.4th at pp. 972-973.) Additionally, we find that under the totality of circumstances presented in the affidavits, there was a fair probability that communications concerning the crimes would be found pursuant to the wiretaps. (*Hobbs*, *supra*, 7 Cal.4th at p. 975; *Sedillo*, *supra*, 235 Cal.App.4th at p. 1055.) Therefore, the court properly denied the motions to quash and traverse the search warrant and suppress evidence.

### H. *Review of sealed transcripts from ex parte in camera hearings*

Ramirez asks that we review the transcripts of certain in camera hearings at which the trial court considered the prosecution's assertions of privilege in response to various discovery requests by the defense. Specifically, the defense sought discovery of information regarding the agreement with the cooperating witness, the cooperating

54

witness's work for the DEA, and statements by another witness regarding the Vietnamese gang's involvement in the kidnapping of Lopez.

The Attorney General agrees that such review is appropriate.

### 1. *Additional background*

Ramirez seeks our independent review of the following ex parte in camera hearings:

1. A hearing on December 23, 2014, on the prosecution's request to delay disclosure of information pursuant to section 1054.7 in order to protect an ongoing federal investigation and prevent the possible loss of evidence in the instant case. Following the hearing, the trial court delayed discovery until January 29, 2015, subject to the prosecution showing good cause for a further delay.

2. A hearing on January 29, 2015, on the prosecutor's motion to show good cause for further delay disclosure of information. The trial court found good cause to delay disclosure and ordered that the material be produced by February 20, 2015.

3. A hearing on February 20, 2015, on the prosecution's motion to delay discovery for one month to complete certain forensic testing. Following the hearing, the trial court found good cause to modify the discovery schedule, ordering partial discovery by March 3, 2015, and full discovery by March 18, 2015.

4. A hearing on April 8, 2015, to review the scope of discovery. The court concluded that good cause existed to delay disclosure and set a May 4, 2015, status date. The prosecution provided the discovery at issue on May 5.

5. A hearing on May 22, 2015, to address the discoverability of certain DEA records by the defense.

6. A hearing on May 26, 2015, where the court continued the previous in camera hearing.

7. A hearing on June 3, 2015, where the court held further in camera discussions pertaining to discovery.

8. A hearing on June 5, 2015, regarding discovery.

9. A hearing on July 22, 2015, regarding the disclosure of evidence to the defense relating to a cooperating witness.  Following this hearing, the trial court ordered limited disclosures of information to the defense concerning DEA payments to the cooperating witness, that witness's disregard for DEA instructions, the witness's current status as a DEA informant, and the scope of work the witness performed as an informant.

### 2. *Applicable law*

Pursuant to *Brady v. Maryland* (1963) 373 U.S. 83, the prosecution must disclose to the defense any information favorable to defendant, and material to guilt or punishment.  (*Id.* at p. 87.)  Section 1054.1 requires disclosure by the prosecution of "[t]he names and addresses of persons the prosecutor intends to call as witnesses at trial" (*id.*, subd. (a)), "[s]tatements of all defendants" (*id.*, subd. (b)), "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial" (*id.*, subd. (f)), and "[a]ny exculpatory evidence" (*id.*, subd. (e)).  However, "materials or information . . . which are privileged pursuant to an express statutory provision, or are privileged as provided by the Constitution of the United States" are exempt from disclosure pursuant to section 1054.6.

The prosecution may withhold evidence where the necessity for confidentiality "outweighs the necessity for disclosure in the interest of justice."  (Evid. Code, § 1040, subd. (b)(2).)  For example, the government may limit the disclosure of information to a defendant who was identified by means of a wiretap, on a showing of good cause, such as danger to a witness or the potential of compromising other investigations.  (§§ 629.70, subd. (d), 1054.7; *Sedillo*, *supra*, 235 Cal.App.4th at p. 1054.)

The government's claims of privilege may be tested by the trial court in an ex parte in camera proceeding.  (Evid. Code, § 915, subd. (b).)  The trial court's discovery rulings are reviewed for an abuse of discretion.  (*People v. Suff* (2014) 58 Cal.4th 1013, 1059.)

In this case, we have reviewed the sealed transcripts of the in-camera hearings. The transcripts constitute adequate records of the trial court's review and reveal no abuse of discretion or violation of Ramirez's due process rights. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1229.)

### *I. Sentence enhancement on count 1*

Ramirez next claims that the trial court abused its discretion in refusing to strike the bodily injury/substantial risk of death enhancement that attached to count 1. We disagree.

#### *1. Additional background*

The jury convicted Ramirez of kidnapping for gain (count 1), in violation of section 209, subdivision (a). Because the jury also found true the allegation that Ramirez had "caused the kidnapped person to suffer bodily harm or intentionally confined the kidnapped person in a way that created a substantial risk of death," the prescribed punishment was life in prison without the possibility of parole. (§ 209, subd. (a).)

Before sentencing, Ramirez brought a motion for a new trial in which he further requested that the trial court strike the bodily harm finding attached to count 1. The trial court denied Ramirez's request at the sentencing hearing, finding that Ramirez's conduct fell within the parameters of the aggravated kidnapping statute.

The trial court explained that it had considered Ramirez's life circumstances, family ties, and lack of prior criminal history. However, Ramirez made a deliberate choice to get involved with the DTO, and as part of that involvement, participated in Lopez's kidnapping, captivity, and torture. The trial court recounted Lopez's "beatings, the loss of consciousness due to suffocation, the being confined in a closet, the atrocities" inflicted on him, and noted that in observing Lopez's testimony, he appeared to be "a broken man." The fact that Ramirez and the others ultimately decided that, based on what had been done to him, Lopez could not have been involved in the burglary of the stash house supported the conclusion that Lopez had been "tortured . . . extensively."

Accordingly, the court declined to strike the bodily harm finding and imposed a sentence of life without the possibility of parole on count 1.

### 2. *Applicable law*

We review the trial court's decision not to dismiss or strike a sentencing allegation under section 1385 for an abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 373-375 (*Carmony*).) A trial court will only abuse its discretion in failing to strike a sentencing allegation in limited circumstances, including "where the trial court was not 'aware of its discretion' to dismiss [citation] or where the court considered impermissible factors in declining to dismiss [citation]." (*Id*. at p. 378.)

It is the defendant's burden on appeal " 'to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' [Citation.] Concomitantly, '[a] decision will not be reversed merely because reasonable people might disagree. "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge." ' " (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977-978; see also *Carmony*, *supra*, 33 Cal.4th at pp. 376-377.)

### 3. *No abuse of discretion*

In declining to strike the sentence enhancement on count 1, the court explained its rationale at length, noting Ramirez's character, life circumstances, family history, and lack of a prior criminal record, but ultimately concluding those factors did not outweigh Ramirez's conduct in connection with Lopez's abduction, captivity, and torture. The record shows that the trial court was well aware of its discretion in this matter and did not consider impermissible factors in reaching its conclusion. Accordingly, it is clear the trial court did not abuse its discretion.

### J. *Correction of abstract of judgment*

Ramirez points out that the abstract of judgment reflects that the jury found true an allegation that he or a principal was armed, as defined by section 12022, subdivision (a)(1), in committing count 5. However, there was no such arming allegation attached to that count in the indictment and the corresponding sentence enhancement must be stricken. The Attorney General agrees that the abstract of judgment is in error. However, because we are reversing Ramirez's conviction on this count, the argument is moot.

### K. *Assembly Bill No. 1869*

Since the sentencing hearing in this case, the Governor signed Assembly Bill No. 1869 into law, which eliminates many fines, fees, and assessments courts impose under a range of statutes, including the criminal justice administration fee imposed under former Government Code section 29550 et seq. (Assem. Bill No. 1869 (2019-2020 Reg. Sess.) §§ 2, 62.) Among other provisions, section 11 of Assembly Bill No. 1869 added Government Code section 6111, which provides that "the unpaid balance of any court-imposed costs pursuant to Section 27712, subdivision (c) or (f) of Section 29550, and Sections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Gov. Code, § 6111, subd. (a).)

Under the plain language of Government Code section 6111, subdivision (a), the unpaid balance of the booking fee imposed in this case must be vacated. (See *People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945.) Given that we are reversing the judgment in this case and remanding for resentencing, we expect the trial court to only impose those fines, fees, and assessments permitted by law at the time of the new sentencing hearing.

### III. DISPOSITION

The judgment is reversed and remanded for possible retrial of counts 4 and 5, conspiracy to commit murder (Pen. Code, §§ 182, subd. (a)(1), 187). If, however, the

59

People fail to bring defendant to a new trial on these counts within 60 days (or, if defendant waives time, within any resulting longer time limit (see Pen. Code, § 1382)), or if the People elect, in a writing filed in the trial court, not to retry defendant on those counts, the trial court shall modify the verdict by striking the convictions on those counts and promptly resentence defendant on the remaining counts.

_____
Greenwood, P. J.

WE CONCUR:


_____
 Elia, J.




_____
 Grover, J.



People v. Ramirez
No. H043461